# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Karen Weigman,

                    Plaintiff,

v.

Everest Institute,

                    Defendant.

Civ. No. 12-1834 (RHK/JJK)
**MEMORANDUM OPINION AND ORDER**

Michelle Dye Neumann, Phillip M. Kitzer, Halunen & Associates, Minneapolis, Minnesota, for Plaintiff.

Jeffrey K. Brown, Amy R. Patton, Andrew K. Haeffele, Payne & Fears LLP, Irvine, California, Steven Paul Marino, Marino Law Firm, Saint Paul, Minnesota, for Defendant.

Plaintiff Karen Weigman filed this action against her former employer, Defendant Everest Institute ("Everest"), alleging she was terminated in violation of the Minnesota Whistleblower Act and public policy for confronting her supervisor about what she believed to be the forgery of internal documents. Everest now moves for summary judgment on Weigman's claims, and, for the reasons set forth below, its Motion will be granted.

## BACKGROUND

The following facts are recited in the light most favorable to Weigman.

In May 2010, Weigman was hired by Everest, a vocational college, as a Program Chair for its Medical Assisting Program. A few months after she was hired, on Saturday, September 11, Weigman's supervisor, Gina LaBounty, emailed her and other program

chairs requesting help in preparing for an important internal audit that was set to begin that Monday. LaBounty specifically requested that Weigman provide proof of her CPR and OSHA training for her employee file "ASAP" because both were required credentials for Weigman's position. The following Monday, September 13, Weigman met with LaBounty to inform her that she had not completed either training and that she was physically unable to complete the CPR test[1] because she was nine months pregnant and experiencing extreme pain (which she later discovered was due to a broken sacrum). After the meeting, she completed the OSHA training online and gave LaBounty the certificate. LaBounty told her she had spoken to the CPR instructor, Ray Craft, about her CPR card. Later that morning, Craft stopped by Weigman's office with a printed CPR card for her to sign, but she didn't.

Weigman spoke with LaBounty again to tell her she was not comfortable signing the card because she had not taken the exam. LaBounty told her that they needed the card in her file for the audit. Weigman asked if she could sign the card and take the physical part of the class after she returned from maternity leave, and LaBounty agreed subject to Craft's approval. Craft also agreed to the accommodation and administered the written exam, which Weigman passed. Later that day, Craft dropped off the CPR card, which Weigman signed and gave to LaBounty.

Several months later, Weigman learned from certain instructors she supervised that LaBounty had told them to sign and backdate instructor-observation forms and create

---

[1] To obtain a CPR certification, an employee needed to complete a classroom course, a vigorous physical skills demonstration, and a written examination.

training certificates, even though the instructors could not verify whether the observations or training actually took place. Weigman believed it was illegal to falsify documents in this manner. On January 10, 2011, in their standard weekly meeting, Weigman told LaBounty that several instructors had informed her that LaBounty directed them to falsify documents. Weigman stated she would not participate in that for any future audits and that she would encourage her staff not to either.

Two days later, on January 12, 2011, the organization Everest used for CPR certification, LifeSavers, received an "anonymous phone call" about Weigman having a CPR card that was not legitimate. LifeSavers passed this information on to Everest's campus liaison, Julie Monette. Monette met with LaBounty and LaBounty's supervisor, Brian O'Hara, to discuss the phone call, and they decided to conduct an investigation into the matter. LaBounty spoke with Weigman about the phone call and told her they were investigating it. Weigman reminded her that she had received the CPR card during the audit but had not taken the physical portion of the class or exam because she had been pregnant. The next day, Weigman requested to speak with human resources, but LaBounty told her to wait.

LaBounty then discussed the matter with Craft, who did not recall administering the written exam to Weigman and denied issuing her a CPR card to sign. He told LaBounty he had to obtain cards from Julie Monette and did not keep extras in his office, but that he had a template on his computer, which was password protected. LaBounty searched for the written exam that Weigman took, but neither she nor Craft located a copy of it. LaBounty also discussed CPR certification with instructor Matthew Johnson,

who told her that all the instructors kept copies of cards at their desks.  Johnson told LaBounty he believed Craft had issued the card to Weigman because Craft had been teaching a CPR class and making CPR cards the day Weigman received it.

LaBounty summarized her investigation and sent it to human resources.  Based on this summary, Everest's Regional Vice President approved LaBounty's recommendation that Weigman be terminated.  On January 14, Weigman met with O'Hara and LaBounty.  She told O'Hara how she received the CPR card, but LaBounty denied knowledge of or involvement in the process.  She also told O'Hara that LaBounty had directed instructors to falsify other documents for the audit, which LaBounty also denied.  O'Hara informed Weigman that she was being terminated for the false CPR card and escorted her out.  Neither Craft nor LaBounty were terminated for their alleged involvement.

In June 2012, Weigman filed the instant action against Everest, alleging that she was terminated for confronting LaBounty about LaBounty's instructions to her and others to falsify documents for Everest's audit.  She asserts claims under the Minnesota Whistleblower Act ("MWA"), Minn. Stat. § 181.932, and for common-law wrongful discharge.  Everest now moves for summary judgment on both claims.  The Motion has been fully briefed, the Court heard oral argument on July 16, 2013, and it is now ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>Ricci v. DeStefano</u>, 557

who told her that all the instructors kept copies of cards at their desks.  Johnson told LaBounty he believed Craft had issued the card to Weigman because Craft had been teaching a CPR class and making CPR cards the day Weigman received it.

LaBounty summarized her investigation and sent it to human resources.  Based on this summary, Everest's Regional Vice President approved LaBounty's recommendation that Weigman be terminated.  On January 14, Weigman met with O'Hara and LaBounty.  She told O'Hara how she received the CPR card, but LaBounty denied knowledge of or involvement in the process.  She also told O'Hara that LaBounty had directed instructors to falsify other documents for the audit, which LaBounty also denied.  O'Hara informed Weigman that she was being terminated for the false CPR card and escorted her out.  Neither Craft nor LaBounty were terminated for their alleged involvement.

In June 2012, Weigman filed the instant action against Everest, alleging that she was terminated for confronting LaBounty about LaBounty's instructions to her and others to falsify documents for Everest's audit.  She asserts claims under the Minnesota Whistleblower Act ("MWA"), Minn. Stat. § 181.932, and for common-law wrongful discharge.  Everest now moves for summary judgment on both claims.  The Motion has been fully briefed, the Court heard oral argument on July 16, 2013, and it is now ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>Ricci v. DeStefano</u>, 557

U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S. 521, 529–30 (2006); Weitz Co. v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

**ANALYSIS**

**I. Minnesota Whistleblower Act**

The MWA prohibits an employer from taking adverse employment action against an employee who, "in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer . . . ." Minn. Stat. § 181.932, subd.1(1). The Court analyzes MWA claims using the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 972, 802 (1973). Sigurdson v. Isanti Cnty., 386 N.W.2d 715, 720 (Minn. 1986); Cokley v. City of Otsego, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001). Under this framework, the burden is on a plaintiff to establish a prima facie case. Cokley, 623 N.W.2d at 630. Next, the defendant must produce a legitimate, non-retaliatory reason for its adverse employment action. Id. Then, the burden is on plaintiff to create a genuine issue of fact that the employer's proffered reason is pretextual. Id.

To establish a prima facie case that Everest violated the MWA, Weigman must show: (1) she engaged in statutorily-protected conduct—that is, she reported a violation or suspected violation of law to her employer in good faith; (2) she suffered an adverse employment action; and (3) the adverse employment action was motivated by her protected conduct. See id.; Holtzman v. Healthpartners Servs., Inc., C7-02-375, 2002 WL 31012186, at *5 (Minn. Ct. App. Sept. 10, 2002). Everest acknowledges that Weigman suffered an adverse employment action but challenges whether she engaged in statutorily-protected conduct and, if she did, whether such conduct motivated her termination.

As to the first element—statutorily-protected conduct—Everest argues that (1) there was no violation of state or federal law to report, and (2) even if there were, Weigman did not report it in good faith within the meaning of the statute. While an actual violation of state or federal law need not have occurred for an employee's report to be protected, the employee must show that the activity reported, *if it turned out to be true*, would violate the law. Kratzer v. Welsh Cos., 771 N.W.2d 14, 22–23 (Minn. 2009) ("If it later turns out that the facts are not as the employee reported them in good faith to be, the conduct is protected so long as the facts, if they had been true, would be a violation of the law."). Thus, Weigman need not show that LaBounty actually had the instructors sign or create documents as alleged, but she must show that such actions, if they occurred, would violate a state or federal law. It is not enough that Weigman *believed* they violated the law. See id. at 21–22. Nor is it enough that such actions violated Everest's internal policies. See id. at 22 ("[W]e have recognized that a mere report of behavior that is

- 6 -

problematic or even reprehensible, but not a violation of the law, is not protected conduct under the [MWA].").

Although not specified in her Complaint, in her Memorandum Weigman asserts that LaBounty's alleged conduct, assuming it occurred, constituted the crime of forgery under Minnesota law. The Minnesota Statutes state, in relevant part, a person is "guilty of forgery" if she "destroys, mutilates, or by alteration, false entry, or omission, falsifies any record, account, or other document relating to a private business." Minn. Stat. § 609.43, subd. 1(5). Case law interpreting this portion of the forgery statute is thin. The parties and this Court have located only a handful of cases discussing its meaning or scope. After reviewing the interpretations set forth in these cases, the Court is doubtful whether LaBounty's alleged conduct constituted forgery.

In State v. Mimbach, 420 N.W.2d 252, 254 (Minn. Ct. App. 1988), the Minnesota Court of Appeals overturned a conviction under the forgery statute, in which the defendant submitted a proof-of-loss form to his insurance company containing false information regarding his store's losses. The court adopted the common-law rule that forgery "cannot be committed by the genuine making of an instrument, although containing false representations made for the purpose of defrauding." Id. (citing 36 Am. Jur. 2d Forgery § 6). In State v. Morua, No. 50-CR-09-1811, 2009 WL 8547365 (Minn. Dist. Ct. Jan. 13, 2010), the district court elaborated on this rule. In Morua, the defendant was charged with forgery for using a false name, address, and photo in her Minnesota identification card. Id. The Morua court distinguished Mimbach, stating, "The legal efficacy of the document at issue in *Mimbach* was not affected by the veracity of the

information it contained.  Id.  By making false entries in the proof of loss form, the *Mimbach* defendant created a *fraudulent document*, not a *forgery*."  Id. (emphases added). In contrast, the Court concluded that by falsifying "core pieces of information" in her state-issued identification, the defendant had (allegedly) "created a document that was not what it purported to be" and was therefore a forgery.  Id.

Under this rule, the Court does not believe that LaBounty's alleged actions—directing persons to sign or backdate forms without allowing them to verify the documents' contents—would constitute forgery.  Weigman does not allege that the documents themselves are false or not what they purport to be; she alleges only that LaBounty—through the instructors—inserted false information or representations into them.  If they contained false information, the observation forms were likely fraudulent, but not necessarily forgeries.

At oral argument, Weigman's counsel compared this case to State v. Thompson, 306 N.W.2d 841 (Minn. 1981), in which the employee of an insurer was convicted of forgery for altering the company's "experience report," which shows all the premiums and claims paid under a policy, to reflect a lower profit to the insurance company before providing the report to its insured, a municipality.  Id. at 842.  The defendant appealed for lack of evidence of his intent and the court affirmed his conviction, stating "the evidence of the defendant's guilt was overwhelming."  Id. at 843.  Defendant argues this case is distinguishable because it involved the alteration of a document, not false entries.  But the Court does not find this distinction relevant because the statute prohibits both alterations and false entries.  Minn. Stat. § 609.43, subd. 1(5) (prohibiting falsification of a

document "by alteration, false entry, or omission"). The defendant in Thompson was no more culpable because he falsified a document through alteration as opposed to false entry.

The court in Mimbach also distinguished Thompson, but on different grounds. It construed the forgery statute to require falsification of a "business record," which it defined as a record that "possesses indicia of reliability because it is kept or compiled for a business purpose." 420 N.W.2d at 255 (citing Minn. R. Evid. 803(6)). The court concluded that an experience report, like the one in Thompson, *was* a business record, but "a proof of loss statement, although made on a form supplied by the insurance company" was *not* because the "statement's business purpose . . . is to finalize the *insured's* claim of loss." Id. The instructor-observation forms at issue here were created and completed by employees of Everest for Everest's own purposes, like the experience report in Thompson. Furthermore, the Court believes they would qualify as business records under Minnesota Rule of Evidence 803(6), to which Mimbach cites. Assuming the forms are business records like the documents in Thompson, the Court remains doubtful whether they were "falsified" and, accordingly, whether there was any crime for Weigman to report.

But even if LaBounty's alleged conduct *were* criminal, the Court agrees with Everest that Weigman did not report it in good faith, within the meaning of the MWA. The MWA "protects the conduct of a neutral party who 'blows the whistle'" on her employer. Obst v. Microtron Inc., 614 N.W.2d 196, 200 (Minn. 2000). It requires that the employee reported a violation or suspected violation "in good faith." To determine

- 9 -

good faith, "the central question is whether the reports were made for the purpose of blowing the whistle, i.e., to expose illegality." Id. at 202. "A court considers the employee's purpose at the time the report was made, not after subsequent events have transpired." Arends v. Extendicare Homes, Inc., Civ. No. 07-995, 2008 WL 1734205, at *4 (D. Minn. Apr. 10, 2007) (Doty, J.) (quotation omitted). Although "good faith" is generally a question of fact, a court may determine that a plaintiff did not engage in statutorily protected conduct as a matter of law. Id.

Here, the Court concludes there is no evidence that Weigman intended to expose an illegality when she told LaBounty she would not "falsify" documents and would encourage her staff not to either. The Minnesota Supreme Court held in Obst that a plaintiff did not make a good-faith report under the MWA because he reported violations only to parties that were involved in or already knew of them and he expressed no intent to have his reports go any further, such as to a governmental body or law enforcement official. 614 N.W.2d at 203 & n.5. The facts of this case are analogous to those of Obst. Weigman reported LaBounty's violations only to LaBounty herself and did not express any intent to have her reports go further.[2] (See Weigman Dep. 176 ("Q: What was your purpose—in your mind when you went to [LaBounty] why did you do that if you weren't going to tell her who [the instructors who reported her] were and what the document[s]

---

[2] Despite not manifesting an intent to tell anyone else when she confronted LaBounty, Weigman did, ultimately, tell O'Hara about LaBounty's violations when she was being investigated. (See Weigman Dep. 245–50.) But exposing LaBounty's misconduct in an attempt to defend her own misconduct does not reflect an intention to "blow the whistle" but rather to shift the blame and save her job. See Obst, 614 N.W.2d at 202 (citing Wolcott v. Champion Int'l Corp., 691 F. Supp. 1052, 1059 (W.D. Mich. 1987) (report not in good faith where purpose was to protect plaintiff's and others' jobs)).

were?  A: What I told her what [sic] I was going to tell them not to do anything that they weren't comfortable with in the next audit."); id. at 180 (" Q: Other than January 10 when you went to Gina LaBounty, did you ever report to any manager or supervis[or] at [Everest] that Gina was doing anything you felt was inappropriate in any way?  A: No.  Q: Did you ever complain to HR?  A: No.  Q: Did you ever complain to any outside agency?  A: No.").)  This behavior in no way indicates or supports an inference that Weigman meant to "blow the whistle" on LaBounty or Everest.  Accordingly, the Court determines that Weigman has not shown she engaged in statutorily-protected conduct, and has therefore failed to establish a prima facie case under the MWA.

## II. Wrongful Discharge

Weigman also asserts a claim for wrongful discharge under Minnesota common law, on the theory that Everest's retaliatory discharge violated public policy.  The Minnesota Supreme Court has only recognized a wrongful discharge claim for employees who were retaliated against for refusing to break a law, rule, or regulation.  See Phipps v. Clark Oil & Refining Corp., 408 N.W.2d 569 (Minn. 1987).  But, as Everest points out, Weigman was never asked to and therefore never refused to break a law, rule, or regulation.  Weigman argues that she refused to participate in the forgery of instructor-observation forms, but the record shows she was never asked to, only her instructors were.  (Weigman Dep. 177 ("Q: But [LaBounty] never asked you to backdate any kind of documents or observations?  A: No.").)  Neither was she asked to forge her CPR card.  (Id. at 175 ("Q: And when you look at the words [LaBounty] used, she never told you to sign the CPR card without fulfilling the requirements; did she?  A: No.").)  So assuming

for the sake of argument that such conduct constitutes forgery, Weigman acknowledges she was not asked to commit forgery. Therefore, she cannot maintain a wrongful-discharge claim for refusal to break a law, rule, or regulation, but must succeed on other grounds.

It is unclear, however, whether the Minnesota Supreme Court would recognize a wrongful-discharge claim on other public-policy grounds. Since Phipps, the court has declined to revisit the viability of public-policy claims. Nelson v. Productive Alternatives, Inc., 715 N.W.2d 452, 457 n.5 (Minn. 2006). In Nelson, the court expressed doubt whether it would expand the holding in Phipps to recognize any other wrongful discharge claim based on public policy, suggesting that delineating public policy is the realm of the legislature, not the courts. Id. ("[W]e also do not address the broader question of whether other discharges in violation of public policy give rise to common-law causes of action, aside from those that we already recognized in Phipps. We do note, however, that this court has generally been reluctant to undertake the task of determining public policy since this role is usually better performed by the legislature.").

The public policy at stake in this case—prohibiting employers from terminating employees who report ostensible violations of the law—has already been addressed by the legislature through the MWA. The Court in Nelson concluded that where the legislature has addressed the general area of policy at issue and the defendant's actions did not violate any statute it created, then it "must conclude that the legislature has implicitly reserved these actions to the discretion of [the defendant]." Id. at 457 ("In so [concluding], we abide by the canon of statutory construction 'expressio unius exclusio

- 12 -

alterius,' meaning the expression of one thing is the exclusion of another."). Because the legislature has already addressed the public policy at issue through the MWL and Everest did not violate it, Weigman's common-law claim is merely an attempt to make an end-run around the statute. Accordingly, the Court will grant summary judgment on Weigman's wrongful-discharge claim as well.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Everest's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment (Doc. No. 23) is **GRANTED** and the Complaint (Doc. No. 1, Ex. A) is **DIMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: July 30, 2013

                                                    s/Richard H. Kyle
                                                    RICHARD H. KYLE
                                                    United States District Judge